## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| James Edward Worthan, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Trans Union LLC, | ) | **COMPLAINT** |
| | ) | **WITH JURY TRIAL DEMAND** |
| Defendant. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*., consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and, the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

1

Trans Union LLC is a consumer credit reporting agency. Trans Union LLC collects and aggregates information on one billion individual consumers in over thirty countries.[1] This includes "200 million files profiling nearly every credit-active consumer in the United States." Its customers include over 65,000 businesses globally.[2]

Plaintiff has a legally protected interest in Trans Union LLC maintaining information concerning Plaintiff's credit worthiness, credit standing, credit capacity, character, and general reputation, in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information. 15 U.S.C. § 1681 ("Congressional findings and statement of purpose").

This case arises from Trans Union LLC's violation of Plaintiff's legally protected interest and Trans Union LLC's widespread pattern and practice of willfully disregarding its duties under the FCRA, including, but not limited to:

- Disregarding balances and other information reported by furnishers of credit information, and instead inserting false, manufactured balance information in consumer reports, and publishing said false information

---

[1] See, https://www.transunion.com/global-presence (accessed November 16, 2017).
[2] See, https://www.transunion.com/solution/customer-credit-check (accessed November 16, 2017).

2

to third parties, in willful violation of its FCRA-mandated duty to follow reasonable procedures to ensure maximum possible accuracy of information when preparing consumer reports;

- Failing to appropriately reinvestigate information disputed by consumers, in willful violation of its FCRA-mandated duty to conduct reasonable reinvestigations of consumers' disputes;

- Failing to notify furnishers of disputed information of consumers' disputes, in willful violation of its FCRA-mandated duty to do so;

- Improperly deleting disputed tradeline information, in willful violation of its duties imposed by the FCRA;

- Failing to provide consumers with prompt notice of the deletion of disputed tradeline information by telephone, in willful violation of its duties imposed by the FCRA;

- Failing to provide consumers with a description of the procedures used to determine the accuracy and completeness of disputed information, in willful violation of its duties imposed by the FCRA; and

- Failing to provide consumers with the business name, address, and telephone number of any furnisher of information contacted in

connection with the disputed information, in willful violation of its

duties imposed by the FCRA.

## PARTIES

1.      Plaintiff, James Edward Worthan, is a natural person who resides in

Douglas County, Georgia.

2.      Plaintiff is an individual and is, therefore, a "consumer" as that term is

defined by 15 U.S.C. § 1681a(c).

3.      Defendant, Trans Union LLC (hereinafter "Trans Union"), is a limited

liability corporation formed under the laws of the State of Delaware, with its

principal place of business in the State of Illinois, and is registered to do business in

the State of Georgia. Trans Union may be served with process via its registered

agent, Prentice-Hall Corporation System, at 40 Technology Parkway South, Suite

300, Norcross, Georgia 30092-2924.

4.      Trans Union regularly assembles and/or evaluates consumer credit

information for the purpose of furnishing consumer reports to third parties and uses

interstate commerce to prepare and/or furnish the reports. Accordingly, Trans Union

is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

5.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6.     This Court has personal jurisdiction over Trans Union, pursuant to O.C.G.A. § 9-10-91(1), because Trans Union frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

7.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district. Pursuant to LR 3.1B(3), N.D.Ga., venue is proper in the Atlanta Division because Trans Union maintains an agent for service of process within the Atlanta Division.

### Factual Allegations Regarding Plaintiff's Mortgage

8.     On or about September 13, 2010, Plaintiff obtained a loan from America Home Key, Inc. for the original principal amount of $71,930.00 (the "Mortgage").

9.     The Mortgage is collateralized by residential real property located at 2052 Hillcrest Drive, Douglasville, Georgia 30135-1052, as evidenced by the

Security Deed recorded at Deed Book 2890, Page 94, in the Superior Court of Douglas County.

10.   On or about October 4, 2010, the Mortgage was transferred from America Home Key, Inc. to State Home Mortgage (hereinafter "State Home"), as evidenced by the Assignment recorded at Deed Book 2899, Page 667, in the Superior Court of Douglas County.

11.   State Home regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. §§ 1681i and 1681s-2.

**Factual Allegations Regarding Plaintiff's Bankruptcy Case**

12.   On August 17, 2017, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 17-64392 (the "Bankruptcy Case").

13.   In Schedule D of his Bankruptcy Petition, Plaintiff listed State Home as having a secured claim for the Mortgage in the amount of $63,273.00.

6

14.    On December 14, 2017, Plaintiff filed his Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future Mortgage payments by Plaintiff to State Home.

15.    On January 18, 2018, Plaintiff's Plan was confirmed.

16.    State Home was served with a copy of the Confirmation Order on January 20, 2018, by the Bankruptcy Noticing Center.

17.    Plaintiff's Confirmed Plan does not call for the surrender of the collateral securing the Mortgage owing to State Home, and Plaintiff has not surrendered the collateral securing the Mortgage owing to State Home.

18.    Accordingly, Plaintiff is not seeking a discharge of his Mortgage. Indeed, the Mortgage is not subject to discharge pursuant to 11 U.S.C. § 1328(a)(1). See, *In re Duke*, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

19.    The Bankruptcy Case is currently pending, and Plaintiff continues continue to substantially perform under the terms of his Confirmed Plan and the underlying Mortgage note.

20.    State Home continues to hold and or service Plaintiff's Mortgage, and Plaintiff continues to materially perform per the terms of the Mortgage note.

21.    The balance of Plaintiff's Mortgage is not $0.

22.    Plaintiff's Mortgage is not closed.

## Factual Allegations Regarding Consumer Reports
## Containing Incorrect Information

23.    The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the following: a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to; the review or collection of an account of the consumer; the underwriting of insurance involving the consumer; determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; used by a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; used by a person who otherwise has a legitimate business need for the information; used in connection with a business transaction that is initiated by the consumer; to review an account to determine whether the consumer continues to meet the terms of the account; and/or used by executive departments and agencies

8

in connection with the issuance of government-sponsored individually-billed travel charge cards. 15 U.S.C. §§1681a(d)(1) and 1681b(a)(3).

24.     The terms "consumer report," "credit report," and "consumer credit report" are used synonymously herein.

25.     The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Approximately two million consumer reports are issued by credit bureaus each day. See,

Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p 48-49, available at

*https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf*

(accessed November 16, 2017).

26.     In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors, and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal

9

Trade Commission, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p iv of Executive Summary, available at

*https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf* (accessed November 16, 2017).

27.     The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id*.

28.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major, because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure. *Id*. at i.

29.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,    *https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/* (accessed November 16, 2017).

## Factual Allegations Regarding the Consumer Credit Reporting Industry, Reporting Standards, and Disputed Information

30.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

31.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

32.    In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers

with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515*.

33.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

34.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

35.    Trans Union has actual knowledge that entities reviewing consumer reports prepared by Trans Union reasonably presume that Trans Union has complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data in those consumer reports.

36.    § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

37.    To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Trans Union LLC, Equifax Information

Services, LLC, Experian Information Solutions, Inc.) along with Innovis Data Solutions, Inc. developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant.

See, *http://www.e-oscar.org/*.

38.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

39.    ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

40.    Trans Union has actual knowledge that entities reviewing consumer reports prepared by Trans Union reasonably presume that Trans Union has complied with its duties under § 1681e in compiling and reporting data with maximum possible accuracy in consumer reports.

13

41.   Trans Union has actual knowledge that entities reviewing consumer reports prepared by Trans Union reasonably presume that Trans Union has complied with its duties under § 1681i in correcting disputed information and thus maintaining the maximum possible accuracy of data reported in consumer reports.

## Factual Allegations Regarding Consumer Reports Containing Incorrect Information, and the Impact on Scoring

42.   The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit scoring system, and utilizes data reported by credit reporting agencies. See, *https://www.myfico.com/credit-education/credit-scores/* (accessed November 16, 2017).

43.   The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

44.   The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf* (accessed November 16, 2017).

14

45.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, *www.myfico.com/credit-education/whats-in-your-credit-score/.*

46.    Payment history is the most important aspect of a consumer's credit score, because it shows how the consumer has managed their finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing their accounts, when their last payments were made, and any recent charges. See, *https://www.transunion.com/credit-score* (accessed November 16, 2017).

47.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

15

48.   Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

49.   Incorrectly reporting the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—with a $0 balance, adversely affects the consumer's FICO score, as it excludes any recent positive payment history associated with that mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

50.   The improper deletion of the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—adversely affects the consumer's FICO score, as it excludes all positive payment history associated with that mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

51.   Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

52.   Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

53.   Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores

16

are typically calculated using a multitude of information, including but not limited to the length and age of credit history, and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*

(accessed November 16, 2017). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

54.    Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*., at 22.

55.    Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores*.

56.    The National Association of Insurance Commissioners (NAIC) is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. See, *http://www.naic.org/index_about.htm*.

57.    The NAIC, advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm.

58.    Payment history, credit history length, and credit mix (the types of credit a consumer has, such as credit cards, a mortgage, auto loans, etc.) account for 60% of a consumer's credit-based insurance score. *Id*.

59.    Incorrectly reporting the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—with a $0 balance adversely affects the consumer's credit-based insurance score, as it excludes any positive payment history associated with that mortgage, it misrepresents the credit history length, and it misrepresents the credit mix.

18

60.   The improper deletion of the tradeline of a mortgage—that has a balance that the consumer is making regular payments on—adversely affects the consumer's credit-based insurance score, as it excludes any positive payment history associated with that mortgage, it misrepresents the credit history length, and it misrepresents the credit mix.

**Factual Allegations Regarding Reporting by Trans Union**

61.   On or about June 7, 2019, Plaintiff obtained a copy of his consumer report as published by Trans Union.

62.   Plaintiff's Trans Union consumer report contained factually false, derogatory information published and reported by Trans Union. Specifically, Trans Union reported Plaintiff's Mortgage owing to State Home with a blank balance and as closed as of October 20, 2017. In addition to the foregoing factual inaccuracies, the tradeline included language that, when read in conjunction with the false blank balance and fake closed date, created the misleading impression that the Mortgage had been discharged in Plaintiff's Bankruptcy Case.

63.   A true and correct copy of the State Home tradeline at issue appeared in Plaintiff's report as follows:

**STATE HOME MORTGAGE  #645000001****
PO BOX 96067
ATLANTA, GA 30347
(404) 679-5294

| | | | | | | |
|---|---|---|---|---|---|---|
| Date Opened: | 09/13/2010 | Balance: | | Pay Status: | Current; Paid or Paying as Agreed |
| Responsibility: | Individual Account | Date Updated: | 05/20/2019 | | |
| Account Type: | Mortgage Account | Last Payment Made: | 05/01/2019 | Date Closed: | 10/20/2017 |
| Loan Type: | FHA REAL ESTATE MORTGAGE | High Balance: | $71,930 | | |

64. Because Plaintiff's Mortgage is not closed, and because Plaintiff continues to make payments pursuant to the Mortgage note, the foregoing derogatory information was inaccurate, misleading, and false.

65. Upon information and belief, Trans Union's reporting of the State Home tradeline with a blank balance and as closed was not reflective of the accurate, factually correct balance that State Home reported to Trans Union.

66. Upon information and belief, Trans Union manufactured the false, derogatory closed date.

67. Upon information and belief, Trans Union has published this false, derogatory information to third parties, including but not limited to the following: to American First Finance on February 7, 2019; to TransUnion Consumer Inte. on November 29, 2018; to TransUnion Consumer Inte. on June 5, 2019; to Customer 2007 via Factortrust Incprog Fina. on March 30, 2019; to James Worthan via Karma TransUnion on May 5, 2019; to Prog Leasing LLC on March 30, 2019, November 21, 2018, and March 17, 2018; to Safeco Insurance Auto for insurance underwriting purposes on March 25, 2019, March 25, 2019, and February 10, 2018; to Liberty

20

Mutual for insurance underwriting purposes on March 25, 2019; to Acceptance Insurance for insurance underwriting purposes on March 25, 2019; to Equifax Consumertid on February 8, 2019, March 7, 2018, November 14, 2017, November 4, 2017, November 3, 2017, November 2, 2017, October 25, 2017, October 18, 2017, October 8, 2017, September 24, 2017, September 22, 2017, September 19, 2017, September 15, 2017, September 12, 2017, and September 11, 2017; to TransUnion Interactive In. on February 7, 2019; to TransUnion Interactive on February 7, 2019; to Lifelock Equifax C via Dir to Cons via Equifax on September 8, 2018 and September 9, 2017; to FiservCheckFree Corporation on August 22, 2018; to Travelers via Travelers for insurance underwriting purposes on August 12, 2018 and February 10, 2018; to TU Interactive on May 29, 2018; to FactAct Free Disclosure on May 29, 2018; to State of Georgia via Database Systems Intl for employment purposes on April 10, 2018; to 174398682 via Creditwise Caponetui for credit monitoring purposes on March 7, 2018; to The HartfordLexis Nexis for insurance underwriting purposes on February 10, 2018; to Progressive Auto 10 for insurance underwriting purposes on February 10, 2018; to Nationwide OLB M-NC for insurance underwriting purposes on January 31, 2018; and to Progressive SA Auto 10 for insurance underwriting purposes on November 29, 2017.

68.    In a letter dated January 3, 2020, Plaintiff disputed the inaccurate and misleading information directly to Trans Union. Plaintiff identified the inaccurate and misleading information, advised Trans Union of the specific facts that rendered the disputed reporting inaccurate and misleading, and informed Trans Union that the inaccurate and misleading information was harming Plaintiff's credit rating. The relevant portion of Plaintiff's dispute is reproduced below.

> On June 7, 2019, your company provided me with my consumer credit report, and I have identified an item which is being reported incorrectly and is harming my credit rating. My mortgage with State Home Mortgage, P.O. Box 96067, Atlanta, Georgia 30347, account number 645000001XXXX, is reporting incorrectly.
> My mortgage is included in my bankruptcy (case number 17-64392, filed August 17, 2017) and is provided for by my bankruptcy plan, but it is a long-term debt that is not subject to discharge. Further, my mortgage *cannot* have been discharged, as my bankruptcy is ongoing, and thus *none* of my debts have been discharged.
> I am disputing the following incorrect information that is being reported in the tradeline for my mortgage with State Home: The account is not closed and should not be reporting a closed date. I am including copies of the documents filed in my bankruptcy that show that the account is not closed. Please contact State Home to confirm this information and update this tradeline. Please forward the enclosed documents to assist State Home with its review.

69.    In support of his dispute, Plaintiff included with the dispute to Trans Union the following documents: a copy of Plaintiff's Chapter 13 Plan; a copy of the Order Confirming Plaintiff's Chapter 13 Plan; a copy of the Proof of Claim filed by State Home; and a copy the Notice of Mortgage Payment Change filed by State Home.

70.   Pursuant to 15 U.S.C. § 1681i, Trans Union had a duty to notify State Home of Plaintiff's dispute within five business days of receiving the dispute, to forward all relevant information and any documents included with Plaintiff's dispute for State Home to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Plaintiff's consumer file.

71.   In a document dated February 6, 2020, Trans Union advised Plaintiff that it had researched his dispute and provided a revised report that reflected its findings.

72.   The reinvestigation report simply deleted the entire tradeline for the State Home Mortgage account. The relevant portion of that reinvestigation is reproduced below.

**STATE HOME MORTGAGE** #645000001**** ( PO BOX 96067, ATLANTA, GA 30347, (404) 679-5294 )
In response to your dispute, this item was **DELETED** from your credit report.

73.   Upon information and belief, Trans Union did not notify State Home of Plaintiff's dispute within five business days of receiving the dispute.

74.   Upon information and belief, Trans Union did not forward all relevant information and the documents included with Plaintiff's dispute for State Home to review.

75.   Upon information and belief, Trans Union did not perform any reinvestigation of Plaintiff's dispute, under either standard procedures or "Expedited Dispute Resolution" procedures, as described by § 1681i(a)(8), but instead simply deleted the entire tradeline for the State Home Mortgage account.

76.   Plaintiff's dispute was neither frivolous nor irrelevant.

77.   Trans Union did not inform Plaintiff that it had determined the dispute was frivolous or irrelevant.

78.   Trans Union did not identify any additional information required to investigate Plaintiff's dispute.

79.   Trans Union did not call Plaintiff regarding the State Home tradeline deletion, as required for an "Expedited Dispute Resolution" under § 1681i(a)(8).

80.   However, Trans Union *did* inform Plaintiff) of his right to request a description of the procedure used to determine the accuracy and completeness of the disputed information, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available, in accordance with § 1681i(a)(6)(B)(iii).

81.   On or about June 11, 2020, Plaintiff caused a letter to be sent to Trans Union (the "Procedures Request"), requesting a description of the procedures Trans

Union used to determine the accuracy and completeness of the disputed State Home Mortgage information in Plaintiff's credit file and on his consumer report.

82.    Plaintiff's June 11, 2020 letter also specifically requested that Trans Union provide the business name, address, and telephone number of any furnisher of information that Trans Union contacted in connection with the information in Plaintiff's credit file and on his consumer report.

83.    While Plaintiff was aware of *an* address for State Home, and included that address in Plaintiff's dispute, data furnishers often maintain multiple addresses, and Plaintiff sought to determine the specific address at which Trans Union actually contacted State Home in connection with Plaintiff's dispute.

84.    Trans Union had an affirmative duty to provide Plaintiff with the requested business name and contact information not later than 15 days after receiving Plaintiff's request pursuant to 15 U.S.C. § 1681i(a)(7).

85.    Trans Union was not relieved of this duty simply because Plaintiff had *an* address for State Home and had included that address in Plaintiff's dispute.

86.    On June 19, 2020, a mere eight days after Plaintiff mailed his June 11, 2020 Procedures Request, Trans Union replied to Plaintiff's Procedures Request with a nonresponsive form letter (the "Form Letter").

87.    A reproduction of the relevant portion of the Form Letter appears as

follows:

Re: Investigation Procedure

TransUnion reviews and considers all relevant information you provide when you open the credit dispute process. If we are able to make changes to your credit report based on information you provided, we will make those changes. Otherwise, we will ask the company reporting the information you disputed to do all of the following:

1. Review relevant information we sent them, including any documents you gave us as part of your dispute
2. Investigate your dispute and verify whether the information they report is accurate
3. Provide us a response to your dispute and update any other information
4. Update their records and systems, if necessary

What to Do Next
If you have questions regarding the results of a recent investigation, please contact the creditor(s) directly. The business name, address, and, if available, telephone number of the source(s) of information contacted in connection with your dispute can be found in the "Investigation Results" document sent at the conclusion of our investigation.

If you need to dispute information on your credit report again in the future, you can do so online at dispute.transunion.com.

Re: Dispute Status

After reviewing your dispute request, we found the information you disputed does not currently appear on your TransUnion credit report. It's possible the information was updated before we reviewed your report or it was reported by one of the other credit reporting companies.

88.    15 U.S.C. § 1681i(a)(7) required Trans Union to provide Plaintiff with

"a description of the procedure <u>used</u> to determine the accuracy and completeness of

the information"; instead, the form letter provided only a general description of the

various ways in which Trans Union responds to consumers' disputes. [Emphasis

added.]

89.    The Form Letter informed Plaintiff only of what Trans Union *might*

*have done* in response to his dispute, in violation of Trans Union's statutory duty to

inform consumers of what it *actually did* to respond to a consumer dispute.

90.   The Form Letter also failed to provide the business name, address, and telephone number of any furnisher of information contacted in connection with the disputed information.

91.   Instead, the form letter stated, "The business name, address, and, if available, telephone number of the furnisher(s) of information contacted in connection with your dispute can be found in the "Investigation Results" document you recently received at the conclusion of our investigation of your last dispute."

92.   However, as the State Home tradeline had been deleted, this information was not included in the "Investigation Results" document.

93.   Trans Union therefore failed to provide the business name, address, and telephone number used to contact State Home in connection with the dispute, in violation of 15 U.S.C. §§ 1681i(a)(6)(B)(iii) and (a)(7).

94.   Trans Union failed to describe the procedures it actually used to determine the accuracy and completeness of Plaintiff's State Home account because no such procedures existed, as Trans Union made no attempt at all to determine the accuracy and completeness of Plaintiff's State Home tradeline.

95.   Trans Union did not provide the business name, address, or telephone number of any furnisher of information contacted in connection with the disputed

information, because Trans Union did not contact any furnisher of information in connection with the disputed information.

96. Instead, Trans Union simply deleted the State Home tradeline, without conducting a reasonable reinvestigation or providing State Home with proper notice of the dispute.

97. By deleting the tradeline without investigating the dispute or notifying the furnisher, Trans Union willfully and recklessly disregarded its duties under the FCRA.

98. Plaintiff's Procedures Request followed Trans Union's own directions on how to obtain information which Plaintiff is specifically legally entitled to receive under the FCRA.

99. Nevertheless, Trans Union's reply was a mere form letter, which was not responsive to the Procedures Request and merely directed Plaintiff back to the reinvestigation report (which contained no useful information, since Trans Union deleted the entire tradeline for the State Home Mortgage account).

100. Despite its clear legal obligation to provide this information, which Plaintiff was legally entitled to receive, Trans Union willfully failed to do so in reckless disregard of its duties under the FCRA.

101.  Trans Union failed to identify any specific procedure which Trans Union actually used in reinvestigating Plaintiff's dispute.

102.  Trans Union failed to provide any specific detail of the procedures because, in fact, it followed none.

103.  Trans Union failed to provide the name, address, and telephone number of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute.

104.  Trans Union failed to provide the name, address, and telephone number of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute because, in fact, Trans Union never notified State Home of Plaintiff's dispute.

### Trans Union's Violations of § 1681e Were Willful

105.  15 U.S.C. § 1681e(b) requires Trans Union to follow reasonable procedures to assure maximum possible accuracy of information whenever it prepares a consumer report.

106.  There is no objectively reasonable interpretation of § 1681e(b) under which Trans Union may legally prepare and publish a consumer report that contains information that Trans Union knows to be false.

29

107.  Trans Union is not directly involved in the consumer credit transactions about which Trans Union reports.

108.  Rather, Trans Union merely assembles and/or evaluates consumer credit information provided to Trans Union by creditors/furnishers who *are* engaged in extending credit to consumers.

109.  Accordingly, the furnishers of such information know far better than the Trans Union what is accurate and factually correct with respect to the balance, status, payment history, etc. of the consumer credit information that furnishers report to Trans Union.

110.  Despite the central role of the furnisher in ensuring accurate credit information, Trans Union regularly disregards the accurate and factually correct mortgage balance that furnishers report to Trans Union.

111.  Instead of reporting the accurate and factually correct mortgage balance, Trans Union regularly manufactures false data, and publishes consumer reports that incorrectly state consumers' mortgages have a closed date.

112.  These falsified consumer reports, including the manufactured closed date, are regularly published to third parties.

113.  Trans Union's regular practice of reporting this false, manufactured information is objectively unreasonable in light of the statutory language of §

1681e(b), which requires Trans Union to "follow reasonable procedures to assure maximum possible accuracy of the information" whenever Trans Union prepares a consumer report.

114.  In this case, Trans Union has disregarded the accurate and factually correct Mortgage balance that State Home reported to Trans Union, and has reported the Mortgage to third parties with a blank balance and a fake closed date.

115.  Trans Union knew that Plaintiff's Mortgage was not closed at the time Trans Union prepared Plaintiff's consumer report.

116.  Trans Union knew that Plaintiff's Mortgage was not closed  at the time Trans Union published Plaintiff's consumer report to third parties.

117.  The closed date contained in Plaintiff's consumer report, and published to third parties, was known by Trans Union to be false and derogatory because the information was manufactured by Trans Union.

118.  No conceivable, objective reading of Trans Union's obligations under § 1681e would allow Trans Union to ignore accurate information provided by a furnisher, manufacture other, inaccurate information, and then use the inaccurate information to falsify a consumer's report.

119. Trans Union's fabrication and dissemination of false, derogatory information about Plaintiff, rises above simple negligence or a careless reading of the statute.

120. Trans Union's fabrication and dissemination of false, derogatory information about Plaintiff was done knowingly and with reckless disregard of its legal duty to follow reasonable procedures to assure maximum possible accuracy of information.

121. Trans Union's fabrication and dissemination of false, derogatory information about Plaintiff was willful.

122. Trans Union's fabrication and dissemination of false, derogatory information about Plaintiff made it highly probable that Plaintiff would be injured.

123. Plaintiff was, in fact, injured, as detailed more fully *infra*.

124. Trans Union's violations of § 1681e were a direct and proximate cause of Plaintiff's injuries, as detailed more fully *infra*, and, as a result, Trans Union is liable to Plaintiff for the full amount of statutory damages, punitive damages, along with the attorneys' fees and the costs of litigation.

## Trans Union's Violations of § 1681i Were Willful

125. 15 U.S.C. § 1681i provides for only two scenarios in which a CRA *may* legally be allowed to refrain from notifying the furnisher of disputed information of

32

a consumer's dispute: (1) if the CRA determines that a consumer's dispute is frivolous or irrelevant; and/or, (2) if the CRA resolves the dispute under an expedited dispute resolution process.

126. Neither scenario applies to Trans Union's conduct complained of herein.

127. The first statutory exception to the notice requirements of § 1681i(a)(2) is provided by § 1681i(a)(3), under which Trans Union *may* be relieved of its duty to notify the furnisher of the disputed information if Trans Union determines that a consumer's dispute is frivolous or irrelevant.

128. To invoke the 1681i(a)(3) exception, Trans Union must make the determination that the dispute is frivolous or irrelevant within five business days of receipt of the dispute, and must notify the consumer of Trans Union's determination.

129. The consumer notice required by § 1681i(a)(3) must: (1) be given in writing or by other means authorized by consumer; (2) be given within five days of Trans Union's determination; (3) state the reason(s) Trans Union determined the dispute was frivolous or irrelevant; and, (4) identify any information required to investigate the disputed information.

130. Trans Union met none of the consumer notice requirements of § 1681i(a)(3).

131. Thus, the "frivolous or irrelevant dispute" exception to the furnisher notice requirements of § 1681i(a)(2) does not apply.

132. The second exception to the notice requirements of § 1681i(a)(2) is provided by § 1681i(a)(8), under which Trans Union *may* be relieved of its duty to notify the furnisher of the disputed information if the dispute is resolved through an expedited resolution process.

133. Under § 1681i(a)(8), a CRA may resolve a consumer's dispute through an expedited resolution process by deleting the disputed information no later than three business days after receipt of the consumer's dispute.

134. The expedited resolution process under § 1681i(a)(8) further requires the CRA to: (1) delete the disputed information within three business days of receiving the consumer's dispute; (2) provide prompt notice of the deletion to the consumer by telephone; (3) inform the consumer of their right to have the CRA notify specific persons, who previously received the consumer's report, that the disputed information has been deleted; and, (5) provide the consumer with written confirmation of the deletion, and a consumer report based on the deletion within five days.

135. Trans Union failed to meet the requirements of § 1681i(a)(8) for an expedited review process.

34

136. Thus, the "expedited resolution" exception to the furnisher notice requirements of § 1681i(a)(2) does not apply.

137. In fact, Trans Union did not claim to be operating under any exception to the furnisher notice requirements of § 1681i(a)(2).

138. Rather, Trans Union claimed to have conducted an investigation the dispute.

139. In the reinvestigation report dated February 6, 2020, and sent directly to Plaintiff at Plaintiff's home address, Trans Union stated, "Our investigation of the dispute you recently submitted is now complete."

140. The statement "Our investigation of the dispute you recently submitted is now complete." is false, as Trans Union conducted no investigation at all.

141. However, the statement does make it clear that Trans Union did not determine Plaintiff's dispute to be frivolous or irrelevant.

142. Further, the statement makes it plainly clear that Trans Union received Plaintiff's dispute, accepted it as valid, purported to have conducted "a reasonable reinvestigation," and thus knew that it had specific statutory duties it was required to fulfill.

143. Nevertheless, Trans Union failed to fulfill those duties.

144. At a minimum, any "reinvestigation" by Trans Union would require Trans Union to notify State Home within five days of Trans Union's receipt of the consumer's dispute, and include all relevant information regarding the dispute. 15 U.S.C. § 1681i(a)(2).

145. Trans Union did not notify the furnisher of the disputed information in this case.

146. Trans Union's regular method of notifying furnishers of consumers' disputes is via ACDVs sent through the e-Oscar system.

147. Trans Union did not send an ACDV to State Home in connection with Plaintiff's dispute.

148. Instead, Trans Union simply deleted the State Home tradeline, without conducting a reasonable reinvestigation and without providing State Home with proper notice of the dispute, in reckless disregard of its duties under the FCRA.

149. Trans Union took specific actions and made affirmative statements which clearly communicated that Trans Union received and accepted Plaintiff's dispute as valid.

150. Absent application of one of the two exceptions described *supra*, no objectively reasonable interpretation of 15 U.S.C. § 1681i would permit Trans Union

to legally fulfill its duties without notifying State Home of Plaintiff's dispute within 5 business days.

151. Trans Union has a regular practice of deleting disputed mortgage tradelines without notifying the furnisher of the disputed information of the consumers' disputes, and without calling consumers to provide prompt notice of the deletion be telephone.

152. Trans Union's deletion of the State Home tradeline without performing a reasonable reinvestigation, without notifying State Home of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, rises above simple negligence or a careless reading of the statute.

153. Trans Union's deletion of the State Home tradeline without performing a reasonable reinvestigation, without notifying State Home of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, was done knowingly and with reckless disregard of its legal duties.

154. Trans Union's deletion of the State Home tradeline without performing a reasonable reinvestigation, without notifying State Home of Plaintiff's dispute, and without providing Plaintiff with prompt telephonic notice of the dispute, was willful.

155. Trans Union's deletion of the State Home tradeline without performing a reasonable reinvestigation, without notifying State Home of Plaintiff's dispute, and

without providing Plaintiff with prompt telephonic notice of the dispute, made it highly probable that Plaintiff would be injured.

156. Plaintiff was, in fact, injured, as detailed more fully *infra*.

157. Trans Union's violations of § 1681i were a direct and proximate cause of Plaintiff's injuries, as detailed more fully below, and, as a result, Trans Union is liable to Plaintiff for the full amount of statutory damages and punitive damages, along with the attorneys' fees and the costs of litigation.

158. Plaintiff's dispute was clear and unambiguous as to the inaccurate information that Trans Union was reporting.

159. Trans Union had clear notice that the information it was reporting was false and misleading.

160. Plaintiff provided Trans Union with all of the necessary information for Trans Union and State Home to investigate Plaintiff's dispute, and to correct the false and misleading information.

161. If Trans Union had conducted a reasonable reinvestigation and notified State Home of Plaintiff's dispute, the State Home Mortgage information would be reported accurately with the correct balance and with no closed date, instead of being deleted from Plaintiff's consumer reports.

162. Trans Union knew that it had a duty to conduct a reasonable reinvestigation of Plaintiff's dispute.

163. Trans Union had the ability to easily conduct a reasonable reinvestigation of Plaintiff's dispute.

164. Despite the foregoing, Trans Union made the intentional choice to not conduct a reasonable reinvestigation of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

165. Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(1) under which Trans Union could legally disregard its duty to conduct a reasonable reinvestigation.

166. Trans Union's failure to conduct a reasonable reinvestigation was willful.

167. Trans Union knew that it had a duty to notify State Home of Plaintiff's dispute within five business days of receiving Plaintiff's dispute.

168. Trans Union had the ability to easily notify State Home of Plaintiff's dispute, via e-Oscar or otherwise.

169. Despite the foregoing, Trans Union made the intentional choice to not notify State Home of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

39

170.  Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(2) under which Trans Union could legally disregard its duty to notify State Home of Plaintiff's dispute.

171.  Trans Union's failure to notify State Home of Plaintiff's dispute was willful.

172.  Trans Union knew that if it chose to resolve Plaintiff's dispute as an Expedited Dispute Resolution under § 1681i(a)(8), then in order to *potentially* avoid the requirement to provide State Home with notice of Plaintiff's dispute under § 1681i(a)(2), Trans Union had a duty to provide Plaintiff with prompt notice of the deletion of the State Home tradeline by telephone.

173.  Trans Union had the ability to easily provide Plaintiff with prompt notice of the deletion of the State Home tradeline by telephone.

174.  Despite the foregoing, Trans Union made the intentional choice to not provide Plaintiff with prompt notice of the deletion of the State Home tradeline by telephone, in reckless disregard of its duties under the FCRA.

175.  Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(8) under which Trans Union could legally not provide Plaintiff with prompt notice of the deletion of the State Home tradeline and disregard its duty to notify State Home of Plaintiff's dispute.

176. Trans Union's failure to provide Plaintiff with prompt notice of the deletion of the State Home tradeline was willful.

177. Trans Union knew that it had a duty to provide Plaintiff with the procedures Trans Union *actually used* to determine the accuracy and completeness of the disputed State Home Mortgage information.

178. Trans Union had the ability to easily provide Plaintiff with the procedures Trans Union *actually used* to determine the accuracy and completeness of the disputed State Home Mortgage information.

179. Despite the foregoing, Trans Union made the intentional choice to not provide the procedures it *actually used*, and instead sent a nonresponsive form letter, in reckless disregard of its duties under the FCRA.

180. Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(7) under which Trans Union could legally disregard its duty to provide the procedures it *actually used*, when it purported to conduct a reasonable reinvestigation of Plaintiff's dispute.

181. Trans Union's failure to notify Plaintiff of the procedures used to investigate Plaintiff's dispute was willful.

182.   Trans Union knew that it had a duty to provide Plaintiff with the business name and contact information of any furnisher that Trans Union contacted in connection with Plaintiff's dispute.

183.   Trans Union had the ability to easily notify State Home of Plaintiff's dispute, and had Trans Union done so, Trans Union could have easily provided Plaintiff with the business name and contact information of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute.

184.   Despite the foregoing, Trans Union made the intentional choice to not notify State Home of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

185.   Under the factual circumstances of this case as detailed herein, there is no objective interpretation of § 1681i(a)(2) under which Trans Union could legally disregard its duty to notify State Home of Plaintiff's dispute.

186.   Trans Union's failure to provide Plaintiff with the business name and contact information for the furnishers it contacted in its investigation of Plaintiff's dispute was willful.

**Trans Union did Not Follow Reasonable Procedures To Assure Maximum
Possible Accuracy of Information Regarding Plaintiff
as Required by the FCRA**

187.  On or about May 28, 2020, Plaintiff caused a Request for Information Pursuant to Section 1024.36 of Regulation X (the "RFI") to be sent to State Home.

188.  Plaintiff's RFI requested that State Home provide, among other things, a summary of State Home's regular reporting on Plaintiff's Mortgage to Trans Union.

189.  Trans Union failed to follow reasonable procedures to assure maximum possible accuracy of Information Regarding Plaintiff by disregarding the true and correct balance information State Home reported to Trans Union, and instead reporting Plaintiff's Mortgage with a blank balance and with a fake closed date.

**Trans Union did Not Notify State Home of Plaintiff's dispute as Required by
the FCRA**

190.  Plaintiff's RFI also requested that State Home inform Plaintiff of any ACDV or other dispute notification that State Home received from Trans Union related to the disputes which are the subject of this lawsuit.

191.  According to State Home's response to Plaintiff's RFI, Trans Union never informed State Home of Plaintiff's dispute.

192.  A true and correct copy of the relevant portion of State Home's response to Plaintiff's RFI is reproduced below.

*<<Copy and paste from RFI Response>>*

193.  Trans Union failed to fulfill its duty under 15 U.S.C. § 1681i(a)(2) by failing to notify State Home of Plaintiff's dispute.

### Trans Union has Exhibited a Pattern and Practice of Disregarding Its Statutorily Mandated Duties Under the FCRA

194.  Upon information and belief, Trans Union regularly deletes disputed tradeline information without conducting a reasonable reinvestigation to determine whether the disputed information is inaccurate, without properly notifying the furnisher of the disputed information of the dispute, and without providing prompt notice of the deletion to the consumer by telephone.

195.  Trans Union's conscious disregarded of its duties under various subsections of § 1681i, including but not limited to paragraphs (a)(1), (a)(2), (a)(4), (a)(7), and (a)(8) is a regular, widespread business practice.

196.  As such, Trans Union has evinced a pattern and practice of recklessly disregarding its statutorily mandated duties under the FCRA.

197.  Trans Union's pattern and practice of violating its statutorily mandated duties under the FCRA is further evidence that Trans Union's actions and omissions complained of herein were willful.

44

## Trans Union has Injured Plaintiff by Publishing False, Defamatory Information About Plaintiff to Third Parties

198. Trans Union injured Plaintiff by publishing the false, defamatory, Mortgage data to third parties.

199. Trans Union has published consumer reports, orally and/or through writing, to various creditors, prospective credit grantors, other credit reporting agencies, and other entities that contain the false, defamatory blank Mortgage balance information and closed date.

200. Upon information and belief, Trans Union has published the false, defamatory Mortgage information on Plaintiff's consumer report to third parties, including but not limited to the following: to American First Finance on February 7, 2019; to TransUnion Consumer Inte. On November 29, 2018; to TransUnion Consumer Inte. On June 5, 2019; to James Worthan via KarmaTransUnion Interact on May 5, 2019; to Customer 2007 via FactorTrust IncProg Fina. on March 30, 2019; to Prog Leasing LLC on March 30, 2019, November 21, 2018, and March 17, 2018; to SafeCo Insurance Auto for insurance underwriting purposes on March 25, 2019, March 25, 2019, and February 10, 2018; to Liberty Mutual for insurance underwriting purposes on March 25, 2019; to Acceptance Insurance for insurance underwriting purposes on March 25, 2019; to Equifax Consumertid on February 8, 2019, March 7, 2018, November 14, 2017, November 4, 2017, November 3, 2017,

November 2, 2017, October 25, 2017, October 18, 2017, October 8, 2017, September

24, 2017, September 22, 2017, September 19, 2017, September 15, 2017, September

12, 2017, and September 11, 2017; to TransUnion Interactive In. on February 7,

2019; to TransUnion Interactive on February 7, 2019; to Lifelock Equifax C via Dir

to Cons via Equifax on September 8, 2018 and September 9, 2017; to

FiservCheckFree Corporation on August 22, 2018; to Travelers via Travelers for

insurance underwriting purposes on August 12, 2018 and February 10, 2018; to TU

Interactive on May 29, 2018; to Factact Free Disclosure on May 29, 2018; to State

of Georgia via Database Systems Intl. for employment purposes on April 10, 2018;

to 174398682 via Creditwide Caponetui on March 7, 2018; to The HartfordLexis

Nexis for insurance underwriting purposes on February 10, 2018; to Progressive

Auto 10 for insurance underwriting purposes on February 10, 2018; to Nationwide

OLB M-NC for insurance underwriting purposes on January 31, 2018; and to

Progressive SA Auto 10 for insurance underwriting purposes on November 29,

2017.

201.  Trans Union knew that the blank Mortgage balance and closed date

were false when Trans Union published that information, and had no factual basis

for stating that the Mortgage balance was blank and that the Mortgage was closed as

of October 20, 2017, as that is not the balance nor the status State Home reported to Trans Union.

202. Trans Union's publication of the false blank Mortgage balance and closed date information negatively affects Plaintiff in the form of dignitary and reputational harm.

203. Trans Union's publication of the false blank Mortgage balance and closed date is a direct and proximate cause of the injury to Plaintiff's dignitary and reputational harm.

## Trans Union has Injured Plaintiff
## By Improperly Diminishing Plaintiff's Credit Score

204. Trans Union has injured Plaintiff by diminishing Plaintiff's FICO and other credit scoring model scores.

205. Trans Union impermissibly deleted Plaintiff's State Home tradeline from Plaintiff's consumer report without conducting a conducting a reasonable reinvestigation of the disputed information, and without notifying State Home of Plaintiff's dispute.

206. The deletion of the State Home tradeline from Plaintiff's consumer report negatively affects and diminishes Plaintiff's FICO and other credit scoring model scores, by excluding otherwise positive payment history, length of credit

history, and credit mix information that would, but for the deletion, be used to calculate Plaintiff's credit score.

207. The Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may

48

still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

208. Plaintiff is desirous of improving his FICO and other credit risk modeling scores.

209. As such, Plaintiff took specific actions to address inaccuracies in his credit report.

210. If Trans Union had conducted a reasonable reinvestigation and had notified State Home of Plaintiff's dispute, the State Home tradeline would be reporting as a current, positive account.

211. If the State Home tradeline was reporting as a current, positive account, Plaintiff's FICO and other credit scoring model scores would be improved.

212. Trans Union's deletion of the State Home tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed

49

information, and without notifying State Home of Plaintiff's dispute, is a direct and proximate cause of the decrease to Plaintiff's FICO and other credit scoring model scores.

## Trans Union has Injured Plaintiff by Creating an Imminent Material Risk of Financial Harm to Plaintiff Via Increased Insurance Costs

213. Trans Union injured Plaintiff by exposing Plaintiff to an imminent material risk of financial harm in the form of higher insurance premiums/rates.

214. Trans Union impermissibly deleted Plaintiff's State Home tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying State Home of Plaintiff's dispute.

215. Insurance carriers regularly review consumers' credit scores and consumer reports to calculate credit-based insurance scores, and thereby determine if the carrier is willing to offer a particular consumer insurance, and what premium the carrier will charge.

216. To wit, Plaintiff's dispute Trans Union report was accessed by the following: by SafeCo Insurance Auto for insurance underwriting purposes on March 25, 2019, March 25, 2019, and February 10, 2018; by Liberty Mutual for insurance underwriting purposes on March 25, 2019; by Acceptance Insurance for insurance underwriting purposes on March 25, 2019; by Travelers via Travelers for insurance

underwriting purposes on August 12, 2018 and February 10, 2018; by The HartfordLexis Nexis for insurance underwriting purposes on February 10, 2018; by Progressive Auto 10 for insurance underwriting purposes on February 10, 2018; by Nationwide OLB M-NC for insurance underwriting purposes on January 31, 2018; and by Progressive SA Auto 10 for insurance underwriting purposes on November 29, 2017.

217. Plaintiff's credit-based insurance scores are calculated based on information contained in Plaintiff's consumer report.

218. Falsely reporting Plaintiff's Mortgage with a blank balance, with a closed date, and with verbiage such as "Included in Bankruptcy" will result in a user of Plaintiff's consumer report to incorrectly conclude that Plaintiff is not current on the Mortgage, and that the Mortgage was discharged in bankruptcy.

219. Improperly deleting Plaintiff's Mortgage tradeline from Plaintiff's consumer report will result in a user of Plaintiff's consumer report to incorrectly conclude that Plaintiff does not have a mortgage.

220. The deletion of the State Home tradeline from Plaintiff's consumer report negatively affects and diminishes Plaintiff's credit-based insurance score, by excluding otherwise positive information, such as length and age of credit history

and the use of certain types of credit, that would, but for the improper deletion, be used to calculate Plaintiff's credit-based score.

221.  Insurers use Plaintiff's credit-based scores to assign Plaintiff to risk pools and to determine the premiums that Plaintiff's will pay for insurance.

222.  Plaintiff is a homeowner, and his Mortgage note requires Plaintiff to maintain insurance on the property securing the Mortgage note.

223.  Plaintiff owns and drives a car, and by law Plaintiff is required to maintain automobile insurance.

224.  The deletion of the State Home tradeline from Plaintiff's consumer report injures Plaintiff by excluding positive information that would otherwise be used to calculate Plaintiff's credit-based insurance scores, and thus creates the imminent material risk that Plaintiff will suffer financial harm in the form of higher homeowner's and automobile insurance rates.

225.  Trans Union's deletion of the State Home tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying State Home of Plaintiff's dispute, is a direct and proximate cause of Plaintiff's imminent material risk of financial harm in the form of higher insurance rates.

**Trans Union has Injured Plaintiff By Creating Impediments
to Plaintiff Refinancing His Mortgage,
Which Further Harms Plaintiff Financially**

226. Trans Union has injured Plaintiff by creating higher barriers and increased costs for Plaintiff to refinance his Mortgage.

227. Trans Union impermissibly deleted Plaintiff's State Home tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying State Home of Plaintiff's dispute.

228. Mortgage lending, including refinancing, is a competitive market, with lenders competing for consumers' business by offering better, more competitive rates and terms, and potential additional savings via quick turnarounds on refinancing.

229. Because mortgage rates fluctuate daily, Plaintiff's ability to capitalize on advantageous mortgage opportunities is dependent on Plaintiff's consumer reports containing complete, accurate data.

230. The existence of consumer reports which inaccurately report Plaintiff's Mortgage with a blank balance and closed date make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

231. Likewise, the existence of a consumer report that does not include Plaintiff's Mortgage also increases the difficulty and cost to refinance a mortgage.

232.  For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just the Plaintiff's credit score–and analyze the Plaintiff's credit history, liabilities, and debts to determine creditworthiness.

U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF* (January 16, 2018) [https://perma.cc/UE3H-N3BS].

233.  To obtain an FHA refinance of the Mortgage, the lender must be able to verify the Plaintiff's payments for the Mortgage for the preceding 12 months. *Id*. at 409.

234.  In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

235.  Plaintiff's correct payment history would be included in Plaintiff's credit report if Trans Union had conducted an appropriate reinvestigation and had notified State Home of Plaintiff's dispute.

236.  However, because the Mortgage is not reported in the Plaintiff's credit report, Plaintiff will be forced to pursue alternative means of demonstrating their payment history to a potential lender.

237.  Because Trans Union improperly deleted the Mortgage from Plaintiff's credit report, Plaintiff will be need to obtain/provide verification of the Mortgage, bank statements, and/or other documents to demonstrate the Plaintiff's payment history for the previous 12 months.  *Id*.

238. This requires Plaintiff to expend time, effort, and money due to Defendant's failure to abide by its obligations under the FCRA to accurately report Plaintiff's credit history.

239.  In order for Plaintiff to obtain a Fannie Mae refinance of the Mortgage, the lender must review Plaintiff's credit report – not just the Plaintiff's credit score – as well as all credit information, to determine that the credit report meets Fannie Mae's requirements and that the data is accurate. Federal National Mortgage Association, *Selling Guide: Fannie Mae Single Family*, 501 (May 31, 2016).

240.  Accurate credit report data is crucial, as errors in Plaintiff's credit report may negatively impact the underwriting recommendation. *Id*. at 327.

241. A key factor in the lender's analysis is the age of Plaintiff's credit history, as older, more established accounts represent a lower credit risk. *Id*. at 503.

242.  However, because Plaintiff's Mortgage trade line has been improperly deleted from Plaintiff's credit report, Plaintiff's will appear to present a higher credit risk than he actually does.

243.  The lender must also review Plaintiff's credit report to obtain information about the status of all mortgage accounts, including their payment history. *Id*. at 504.

244.  However, because Plaintiff's credit report does not contain adequate information regarding the Mortgage Plaintiff must work with the lender to obtain/provide the necessary information via a mortgage verification, loan payment history from State Home, and/or Plaintiff's canceled checks for the last 12 months. *Id*.

245.  In total, Trans Union's improper deletion of the Mortgage tradeline from Plaintiff's credit report will dramatically increase the time, effort, and money which would be required for Plaintiff to refinance his Mortgage.

246.  Due to Defendant's improper deletion of Plaintiff's mortgage tradeline, in order to refinance his Mortgage, Plaintiff would be required to gather a multitude of facts and figures from Plaintiff's current lender in order to demonstrate to any prospective lender that Plaintiff actually *has* a mortgage, and that Plaintiff fit within the lender's mortgage lending guidelines and approval standards.

247. This information is data that would be reflected in Plaintiff's consumer reports, if the reports were accurate and complete.

248. Plaintiff is desirous of more favorable mortgage terms.

249. Plaintiff's pending bankruptcy does not preclude Plaintiff from obtaining credit or refinancing the Mortgage. On the contrary, and it is not uncommon for consumers in an active chapter 13 bankruptcy case to access the credit markets form the replacement or acquisition of vehicles and the refinancing of mortgage debt.[3]

250. In point of fact, the FHA has a program for approving borrowers who are still making payments in a pending/active a Chapter 13 Bankruptcy. U.S. Department of Housing and Urban Development, *HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance* (March 24, 2011) p 4-C-13, available at *https://www.hud.gov/sites/documents/41551HSGH.PDF*,

See also, *https://www.fha.com/fha_requirements_credit.*

251. The improper deletion of the State Home tradeline from Plaintiff's consumer report injures Plaintiff by creating barriers to Plaintiff's ability to

---

[3] The Federal Rules of Bankruptcy Procedure specifically provide for the method by which consumers in an active bankruptcy obtain approval for obtaining credit. FRBP 4001(c).

refinance the Mortgage, and by increasing the costs that Plaintiff will incur upon attempting to refinance the Mortgage.

252. Trans Union's deletion of the State Home tradeline from Plaintiff's consumer report without conducting a reasonable reinvestigation of the disputed information, and without notifying State Home of Plaintiff's dispute, is a direct and proximate cause of Plaintiff's increased difficulty of refinancing the Mortgage and the higher costs that Plaintiff will incur upon attempting to refinance the Mortgage.

## Trans Union has Injured Plaintiff by Failing to Disclose Information that Plaintiff is Legally Entitled to Receive from Trans Union

253. Trans Union has injured Plaintiff by failing to disclose information that Plaintiff is legally entitled to receive from Trans Union.

254. On two separate occasions, Plaintiff requested specific information from Trans Union regarding the procedures Trans Union followed and the contact information Trans Union used to contact State Home, when it purported to have reinvestigated Plaintiff's dispute and deleted information from his credit file and consumer report.

255. Despite Trans Union's clear legal obligation to provide this information, which Plaintiff was legally entitled to receive, Trans Union willfully failed to do so in reckless disregard of its duties under the FCRA.

256. The invasion of Plaintiff's right to receive information from Trans Union regarding the procedures Trans Union followed, and the contact information Trans Union used to contact State Home, is not hypothetical, uncertain, or abstract – Plaintiff did not receive information to which he was legally entitled to receive from Trans Union.

257. The Court has held that held that statutory violations alone, under the FCRA, Fair Debt Collection Practices Act, Telephone Consumer Protection Act, and Video Privacy Protection Act, can be sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Church v. Accretive Health, Inc.*, 654 Fed. Appx. 990 (11th Cir. 2016); and, *Perry v. Cable News Network, Inc., et al.*, No. 16-13031 (11th Cir. April 27, 2017).

258. An injury-in-fact sufficient to satisfy Article III standing requirements "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Church*, at 993, quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).

259. Trans Union has injured Plaintiff's statutorily-created right to receive specific information from Trans Union pursuant to the FCRA.

260. The FCRA creates a private right of action, which Plaintiff seeks to enforce.

59

261.  The Act requires Trans Union to disclose specific information regarding the procedures Trans Union followed, and who Trans Union contacted, when Trans Union purported to have reinvestigated Plaintiff's dispute, and to make that disclosure within fifteen days of receiving Plaintiff's request for the information. 15 U.S.C. § 1681i(a)(7).

262.  Trans Union failed to provide a description of the procedures it actually followed, and instead responded to Plaintiff's request with a vague form letter that stated what Trans Union *might* have done depending on what information Plaintiff submitted.

263.  Trans Union failed to provide the name and/or contact information of any furnisher of information that Trans Union contacted in connection with its alleged reinvestigation of Plaintiff's dispute.

264.  Further, Trans Union's failure to provide the name and/or contact information of any furnisher of information that Trans Union contacted in connection with its alleged reinvestigation of Plaintiff's dispute is more than a bare procedural or statutory violation, divorced from any real-world effect.

265.  State Home maintains multiple addresses for various purposes, and Plaintiff sought to determine the specific address at which Trans Union actually contacted State Home in connection with Plaintiff's dispute.

266.  Trans Union's willful failure to provide this information denies Plaintiff the ability to contact the department and/or individual(s) at State Home that process FCRA disputes.

267.  Trans Union's willful failure to provide this information denies Plaintiff the ability to follow up in any meaningful way on Trans Union's alleged reinvestigation of Plaintiff's dispute.

268. Trans Union's willful failure to provide this information thwarts Plaintiff's efforts to ensure Plaintiff's consumer report is fair, accurate, and correct.

269.  Trans Union's willful failure to provide this information makes the credit reporting dispute/resolution process inefficient and ineffective for Plaintiff.

270.  Trans Union's failure to provide Plaintiff with specific information that Plaintiff is legally entitled to receive from Trans Union is the direct and proximate cause of Plaintiff's inability to resolve Plaintiff's credit reporting issues.

271.  Trans Union's failure to provide Plaintiff with specific information that Plaintiff is legally entitled to receive from Trans Union is the direct and proximate cause of Plaintiff's inability ensure Plaintiff's consumer report is fair, accurate, and correct.

## **Damages**

272.  Trans Union's conduct in connection with this case was willful.

61

273.   Specifically, Trans Union willfully:

a.   Reported false information regarding Plaintiff and the Mortgage to third parties;

b.   Failed to conduct a reasonable reinvestigation into Plaintiff's dispute;

c.   Failed to notify State Home of Plaintiff's dispute;

d.   Failed to provide Plaintiff with prompt notice of the State Home tradeline deletion by telephone;

e.   Failed to provide Plaintiff with the procedures Trans Union *actually used* to determine the accuracy and completeness of the disputed State Home information; and

f.   Failed to provide Plaintiff with the business name and contact information of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute; and

g.   Created impediments and additional financial barriers to the Plaintiff refinancing his existing mortgage obligation and otherwise accessing the credit markets;

274.   These willful actions were taken by Trans Union in reckless disregard of its duties under the FCRA.

275.  As a result of Trans Union's willful actions and omissions, Plaintiff is entitled to recover statutory damages.

276.  As a result of Trans Union's willful actions and omissions, Plaintiff is entitled to recover punitive damages.

277.  As a result of Trans Union's willful actions and omissions, Plaintiff is entitled to recover the costs of this action together with reasonable attorney's fees as determined by the court.

278.  As a result of the actions and omissions of Defendants, Plaintiff's actual damages include the illegitimate suppression of Plaintiff's FICO credit score and other credit rating modeling scores.

279.  Trans Union's failures to correct and clear the inaccuracies on Plaintiff's credit report creates a material risk of financial harm to Plaintiff stemming from the decreased perception of Plaintiff's creditworthiness.

## CAUSES OF ACTION

### COUNT I

#### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
#### 15 U.S.C. § 1681e(b)

280.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

63

281. Pursuant to § 1681e(b), Trans Union is responsible for following reasonable procedures to assure maximum possible accuracy of information concerning Plaintiff whenever they prepare consumer reports about Plaintiff.

282. Trans Union disregarded State Home's reporting of the correct Mortgage balance.

283. Trans Union instead reported the Mortgage balance as blank and with a closed date.

284. Trans Union reported the Mortgage balance as blank and with a closed date in reckless disregard of its duties under the FCRA.

285. Upon information and belief, Trans Union reported the false closed date and blank Mortgage balance to third parties, in reckless disregard of its duties under the FCRA.

286. Upon information and belief Trans Union has a policy/procedure in place, whereby once a furnisher reports a consumer's mortgage account with a Consumer Information Indicator indicating that the consumer is in bankruptcy, or Trans Union learns of the bankruptcy via a consumer's dispute, Trans Union thereafter disregards the true and correct balance reported by the furnisher, and incorrectly reports the mortgage account with a blank balance and a closed date.

287. Upon information and belief, Trans Union's policy/procedure of incorrectly reporting mortgages with a blank balance and a closed date, as described above, is widespread, a regular business practice within Trans Union, and not an isolated incident.

288. Trans Union has evinced a pattern and practice of willfully disregarding furnishers' reporting and incorrectly reporting mortgage balances as blank with a closed date, in reckless disregard of its duties under the FCRA.

289. As described herein, Trans Union violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in his consumer report, in reckless disregard of its duties under the FCRA.

290. Trans Union's actions and omissions as described herein were willful, rendering Trans Union liable to Plaintiff for statutory and/or punitive damages pursuant to 15 U.S.C. § 1681n.

291. Plaintiff is entitled to recover costs and attorney's fees from Trans Union pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(1)(A)

292.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

293.  Under the FCRA, Trans Union has a duty to make reasonable efforts to reinvestigate and correct inaccurate or incomplete information brought to its attention by Plaintiff. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).

294.  To determine whether Plaintiff identified a factual inaccuracy on his consumer report that would trigger Trans Union's duty to reinvestigate, the decisive inquiry is whether Trans Union could have uncovered the inaccuracy if it had reasonably reinvestigated the matter. *Id*. See also, *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68, 2008 U.S. App. LEXIS 8030, *17-18.

295.  Trans Union could have uncovered the inaccuracy if Trans Union had reasonably reinvestigated the dispute submitted by Plaintiff.

296.  Pursuant to §1681i(a)(1)(A), Trans Union had an affirmative duty to independently reinvestigate the dispute submitted by Plaintiff.

297.  A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the

66

substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

298.  In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Trans Union was required to review and consider all relevant information submitted by Plaintiff.

299.  As described herein, Trans Union violated 15 U.S.C. § 1681i(a)(1)(A) in multiple ways, including without limitation, by failing to conduct a reasonable reinvestigation, either standard or expedited, of Plaintiff's dispute.

300.  Trans Union's actions and omissions as described herein were willful, rendering Trans Union liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

301. Trans Union's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

302.  Plaintiff is entitled to recover costs and attorney's fees from Trans Union pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT III

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(2)

303.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

304.  Under the FCRA, Trans Union has a duty to make reasonable efforts to reinvestigate and correct inaccurate or incomplete information brought to its attention by Plaintiff. *Cahlin*, 936 F.2d at 1160.

305.  To determine whether Plaintiff identified a factual inaccuracy on his credit report that would trigger Trans Union's duty to reinvestigate, the decisive inquiry is whether Trans Union could have uncovered the inaccuracy if it had reasonably reinvestigated the matter.  *Id.*; and *DeAndrade*, 523 F.3d at 68.

306.  Trans Union's reasonable reinvestigation, as required by the FCRA, consists largely of triggering the investigation by the furnisher, as the furnisher of information stands in a far better position to make a thorough investigation of the accuracy of the disputed information than Trans Union does. *Serfess v. Equifax Credit Info. Servs.*, No. 13-406 (RBK/JS), 2014 U.S. Dist. LEXIS 120138, at *20-21 (D.N.J. Aug. 28, 2014).

307.  Trans Union could have uncovered the inaccuracy if Trans Union had reasonably reinvestigated the dispute submitted by Plaintiff.

308.  Trans Union could have uncovered the inaccuracy if Trans Union had notified State Home of Plaintiff's dispute.

309.  Pursuant to § 1681i(a)(2), Trans Union had a duty to notify State Home of Plaintiff's dispute within five business days of receiving the dispute, and to

provide State home all of the relevant information Plaintiff provided to Trans Union in his dispute.

310.  As described herein, Trans Union violated 15 U.S.C. § 1681i(a)(2) by failing to properly notify State Home of Plaintiff's dispute and/or by failing to provide State Home all of the relevant information Plaintiff provided to Trans Union in his dispute.

311.  Trans Union's actions and omissions as described herein were willful, rendering Trans Union liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

312. Trans Union's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

313.  Plaintiff is entitled to recover costs and attorney's fees from Trans Union pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT IV

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(7)

314.  Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

315.  Pursuant to § 1681i(a)(7), Trans Union had a duty to provide Plaintiff a description of the procedures Trans Union actually used to determine the accuracy

and completeness of the disputed State Home Mortgage information concerning Plaintiff in his file and consumer report.

316. As described herein, Trans Union violated 15 U.S.C. § 1681i(a)(7) by *twice* failing to provide Plaintiff a description of the procedures Trans Union actually used to determine the accuracy and completeness of the disputed State Home Mortgage information concerning Plaintiff in his file and consumer report.

317. Pursuant to § 1681i(a)(7), Trans Union had a duty to provide Plaintiff with the business name and contact information of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute.

318. As described herein, Trans Union violated 15 U.S.C. § 1681i(a)(7) by *twice* failing to provide Plaintiff with the business name and contact information of any furnisher of information that Trans Union contacted in connection with Plaintiff's dispute.

319. Trans Union's actions and omissions as described herein were willful, rendering Trans Union liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

320. Trans Union's actions and omissions as described herein were undertaken in reckless disregard for its duties under the FCRA.

70

321. Plaintiff is entitled to recover costs and attorney's fees from Trans Union pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

322. Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in his favor and against Trans Union for:

a) Statutory damages pursuant to 15 U.S.C. § 1681n;

b) Punitive damages pursuant to 15 U.S.C. § 1681n;

c) Actual damages pursuant to 15 U.S.C. § 1681o;

d) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e) Such other and further relief as may be just and proper.

Respectfully submitted this 29th day of July, 2020.

**BERRY AND ASSOCIATES**

*/s/ Joseph L. Erkenbrack*

Matthew T. Berry
Georgia Bar No. 055663
*matt@mattberry.com*

Adam J. Klein
Georgia Bar No. 425032
aklein@mattberry.com

Joseph L. Erkenbrack
Georgia Bar No. 801728
jerkenbrack@mattberry.com

Berry & Associates
2751 Buford Highway, Suite 600
Atlanta, Georgia 30324

OFFICE    (678) 996-5172
FAX       (678) 996-5198

Counsel for Plaintiff